**UNITED STATES DISTRICT COURT DISTRICT OF MARYLAND**

**BALTIMORE DIVISION**


**DAMILOLA M. OBEMBE,**

Plaintiff,

 **v.**


**CAREFIRST MANAGEMENT COMPANY, LLC**

Defendant.


**Case No: GLR 25-CV-1933**


<u>**SECOND AMENDED COMPLAINT**</u>


**1. Plaintiff Damilola M. Obembe (Damilola Obembe),** by and through this Complaint, brings this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12101 et seq., seeking redress for unlawful and pervasive employment discrimination, retaliation, unlawful retaliation, disparate treatment based on National Origin, Race and failure to accommodate, committed by her employer, Carefirst Management Company LLC.

2. This action arises from a sustained hostile work environment severe or pervasive together with related discrimination and retaliation, created and condoned by CareFirst on the basis of Plaintiff's race (Black/African), national origin (Nigerian), and psychiatric disability; Over many

months, Plaintiff was excluded from core work and key communications, falsely disciplined, subjectedto a retaliatory performance evaluation,and denied reasonable accommodation, ongoing reprisals that a reasonable employee would find intolerable.

3. Plaintiff has exhausted all administrative prerequisites required under Title VII of the Civil Rights Act of 1964 and the Maryland Fair Employment Practices Act (FEPA). On May 28, 2025, the U.S. Equal Employment Opportunity Commission (EEOC) issued a Notice of Right to Sue upon request in Charge No. 12F-2024-01451,authorizing this action under **Title VII, the ADA, and GINA**. Plaintiff commenced this action within ninety (90) days of receipt.

4. Plaintiff filed the original Complaint on June 17, 2025, within the 90-days of receipt of the EEOC Notice of Right-to-Sue dated May 28, 2025, which Plaintiff received the same day. Plaintiff also dual-filed with the Maryland Commission on Civil Rights (MCCR) under Charge No. 12F-2024-01451, and on March 3, 2025 amended the charge to add ADA/ADAAA issues arising from the same facts and decision-makers. Accordingly, Plaintiff invokes the statutory right to sue under Title VII and the ADA/ADAAA (and preserves parallel remedies under Maryland FEPA). Claims under 42 U.S.C. § 1981 requires no administrative exhaustion.

Plaintiff demands a jury trial on all issues triable by the jury.

Plaintiff alleges as follows;

## <u>NATURE OF THE ACTION</u>

5. This action challenges a systemic pattern of discrimination in which Carefirst Management Company LLC. marginalized Plaintiff, a Black African of Nigerian national origin, in favor of

South Asian employees of Indian national origin. Plaintiff was recruited for her Salesforce expertise but was swiftly excluded from development work, denied project access, disparaged, and isolated, while South Asian, Indian colleagues with lesser qualifications were elevated and entrusted with core technical control.

6. CareFirst's conduct was intentional and pretextual. Plaintiff's manager Allen Charlene and Director Sandra Santos stripped her of deployment access, excluded her from meetings, and falsely labeled her insubordinate, even as Indian colleagues were promoted and shielded from scrutiny. This disparate treatment was severe, continuous, and objectively hostile, meeting the standard recognized by the Supreme Court in Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993).

7. The hostile work environment inflicted lasting psychological harm. Plaintiff has been formally diagnosed with PTSD, major depressive disorder with Suicide Ideation, anxiety disorder, and cognitive dysfunction conditions recognized as disabilities under the ADA Amendments Act. As confirmed by Colwell v. Rite Aid Corp., 602 F.3d 495 (3d Cir. 2010), and Fox v. Costco Wholesale Corp., 918 F.3d 65 (2d Cir. 2019), psychiatric disabilities arising from workplace discrimination are actionable and require accommodation. CareFirst ignored Plaintiff's requests for accommodation and instead retaliated against her.

8. The EEOC's Enforcement Guidance on National Origin Discrimination (2016) prohibits assignment decisions based on stereotypes that "foreign workers" are more capable, and its psychiatric disability guidance (1997) confirms that depression, PTSD, and anxiety qualify as disabilities under 42 U.S.C. § 12102(1) and 29 C.F.R. § 1630.2(h). CareFirst disregarded both,

operating a project team where Indian nationals were favored, and Plaintiff—the only Black African (Nigerian) professional was systematically excluded despite her Salesforce credentials.

9. Plaintiff brings this action under Title VII, 42 U.S.C. § 1981, and the ADAAA to redress unlawful discrimination, hostile work environment, retaliation, and failure to accommodate, and to hold CareFirst accountable for its deliberate and systemic misconduct.

## Delegation of Salesforce Implementation to Third-Party Vendors

10. CareFirst delegated the bulk of its Salesforce Health Cloud (V12/PDMES) implementation to third-party vendors Cognizant, Infosys, and PwC Acceleration Centre, all of which are widely documented for staffing overwhelmingly with South Asian employees of Indian national origin. As a result, the project workforce was demographically distorted, with Indian nationals disproportionately placed in technical roles.

11. Plaintiff, a certified Salesforce Technical professional and the only Black African of Nigerian national origin on the team, was recruited as a Lead Business Analyst to contribute technical expertise. Instead, within two months she was sidelined, denied meaningful assignments, stripped of deployment access, excluded from meetings, and ultimately given a falsified evaluation after raising concerns of discrimination.

12. By contrast, South Asian colleagues of Indian origin, some with equal or lesser qualifications, were elevated and entrusted with privileged system control. The PwC Acceleration Centre support team, entirely Indian-staffed, was granted full technical authority under the same managerial chain.

13. Plaintiff does not challenge CareFirst's general diversity metrics but exposes a project-specific pattern: within the V12/PDMES implementation, Black African, Nigeria Professional was systematically excluded while South Asian Indian employees were favored, a disparity that reflects intentional bias in assignments and access to opportunity.

## **Hostile Work Environment and Disparate Treatment of Plaintiff**

14. CareFirst subjected Plaintiff, a Black African of Nigerian national origin, to a hostile work environment and disparate treatment through a sustained pattern of exclusion and retaliation carried out consistently **over an eleven-month period**. During this time, Plaintiff was systematically denied technical assignments, excluded from Salesforce V12 project meetings and communications, stripped of deployment access, and deprived of training opportunities, while South Asian colleagues of Indian origin with equal or lesser qualifications were elevated and entrusted with privileged system control.

15. Plaintiff's Salesforce expertise was repeatedly undermined and discredited, her contributions dismissed, and her performance evaluations manipulated to fabricate deficiencies. Manager Allen Charlene subjected her to condescension, micromanagement, and retaliatory false allegations, including a fabricated insubordination report that escalated to a 911 call. These actions, repeated over the course of nearly a year, collectively isolated Plaintiff, publicly minimized her role, and deprived her of equal participation in the project.

16. The hostile environment produced severe psychological harm. Plaintiff has been formally diagnosed with PTSD, major depressive disorder, and anxiety disorder caused by workplace

racial trauma, resulting in cognitive dysfunction, suicidal ideation, and the need for protected medical leave and treatment, including Spravato therapy for treatment-resistant depression.

17. CareFirst leadership including Plaintiff's manager, director, employee relations, and HR were repeatedly placed on notice of the discriminatory treatment but failed to take corrective action. An objectively reasonable employee would find that, viewed in its totality and sustained over eleven months, the Salesforce Configuration and Automation Team (PDMES) operated in an environment hostile to a Black African professional excluded on the basis of race, national origin, and resulting disability.

18. These acts violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981, which prohibit discrimination based on race and national origin, as well as Title I of the Americans with Disabilities Act, as amended, which prohibits hostile work environments and retaliation against employees with psychiatric disabilities.

19. Plaintiff seeks declaratory, injunctive, and compensatory relief to redress these unlawful practices and to ensure that technical assignments at CareFirst are made free of national origin stereotyping, racial bias, and retaliation.

## PARTIES

20. **Plaintiff Damilola Obembe,** is a lawful permanent resident of the United States, born in Nigeria and of Nigerian national origin and Black African racial identity. She resides in the State of Maryland. Plaintiff is a member of a protected class as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, as

amended, 42 U.S.C. § 1981. These statutes prohibit discrimination based on national origin, race, and color, including where such discrimination is motivated by bias against non-citizens, immigrants, or ethnic minorities.

21. Plaintiff has exhausted all administrative remedies as required by 42 U.S.C. § 2000e–5 by timely filing a charge of discrimination against Carefirst Management Company LLC. with the Maryland Commission on Civil Rights ("MCCR"), which has a worksharing agreement with the U.S. Equal Employment Opportunity Commission ("EEOC"), and received a Notice of Right to Sue. Plaintiff has satisfied all conditions precedent to the institution of this lawsuit.

**22. Defendant Carefirst Management Company LLC. ("CareFirst")** is a non-profit health insurer headquartered in Baltimore, Maryland, with operations throughout the District of Columbia, Maryland, and Northern Virginia. CareFirst is one of the largest healthcare insurers in the Mid-Atlantic region and at all relevant times employed more than 500 individuals within the meaning of 42 U.S.C. § 2000e(b).

23. Defendant Carefirst Management Company LLC. ("CareFirst"), at all relevant times, CareFirst has continuously employed more than 500 employees and has been an "employer" within the meaning of Section 701(b) of Title VII, 42 U.S.C. § 2000e(b), and Section 1981 of the Civil Rights Act of 1866.

24. At all relevant times, Defendant acted through its Officers, Managers, Agents, Vendors, Contract Workers and employees (Full Time & Temp), including but not limited to Director Sandra Santos and Manager Allen Charlene, Tupakula Balakrishna, Ajinkya Devi, HR Director

Alex who exercised authority over project staffing, work assignments, and performance evaluations.

25. Defendant is liable for the acts and omissions of its officers, managers, HR investigators, and department supervisors under the doctrine of "**respondeat superior**" and agency law.

## JURISDICTION

26. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Americans with Disabilities Act (ADAAA).

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)–(4) (civil-rights jurisdiction).

27. The Court has personal jurisdiction over **CareFirst Management Company LLC** because it is headquartered in Maryland, conducts substantial business here, and the events giving rise to these claims occurred in this District.

To the extent any state-law claims are asserted, the Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

## VENUE

28. Venue is proper in the United States District Court for the District of Maryland under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e–5(f)(3), as all or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and Defendant Carefirst Management Company LLC. maintains business operations in Maryland and employed Plaintiff within this district.

29. The Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices described herein were committed within this judicial district, and Plaintiff was employed in the District of Maryland by Defendant Carefirst Management Company LLC.

30. At all relevant times, Carefirst Management Company LLC. ("CareFirst") was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), with more than 500 employees across multiple jurisdictions. It is a nonprofit health insurer headquartered in Maryland and is engaged in interstate commerce and federally regulated business operations.

31. Plaintiff has timely exhausted administrative remedies. The Maryland Commission on Civil Rights ("MCCR") received Plaintiff's signed Charge on October 25, 2024, which was cross-filed with the EEOC under the work-sharing agreement and alleged discrimination, disparate treatment, hostile work environment, and retaliation based on national origin. On March 3, 2025, Plaintiff emailed MCCR to amend the Charge to add ADA-based disability claims and supplied contemporaneous medical-leave documentation; MCCR responded the same day confirming receipt of the Charge and advising that Plaintiff could request a Right-to-Sue on or after April 23, 2025

32. On May 28, 2025, the EEOC (Philadelphia District Office) issued a "Notice of Right to Sue (Issued on Request)" for Charge No. 12F-2024-01451, expressly stating that Plaintiff's lawsuit under Title VII or the ADA must be filed within 90 days of receipt. Plaintiff filed this action within 90 days.

**Administrative Exhaustion And Timeliness**

33. Plaintiff timely filed a dual-filed charge with the Maryland Commission on Civil Rights ("MCCR") and the EEOC (Charge No. 12F-2024-01451) on October 25, 2024, alleging national-origin discrimination, hostile work environment, and retaliation.

34. On March 3, 2025, Plaintiff amended the charge to include disability discrimination, failure to accommodate, and ADA/ADAAA retaliation based on the same facts and decision-makers.

35. The EEOC issued a Notice of Right-to-Sue dated May 28, 2025, which Plaintiff received on or about May 28, 2025, authorizing this action under **Title VII, the ADA, and GINA**.Plaintiff commenced this action on June 17, 2025 within 90 days of receipt.

36. Accordingly, all conditions precedent to action under 42 U.S.C. § 2000e-5(f)(1) and 42 U.S.C. § 12117(a) has occurred and has been satisfied.

36. This Second Amended Complaint is filed by leave of Court and relates back to the original filing under Fed. R. Civ. P. 15(c)(1)(B) because it arises from the same conduct, transactions, and occurrences.

37. Plaintiff also brings parallel claims under 42 U.S.C. § 1981 based on her identity as Black/African, Nigerian ; Claims under 42 U.S.C. § 1981 require no administrative exhaustion and are pled separately as race-based discrimination and retaliation.

**Section 1981 Allegations (Applicable to Counts I–III)**

38. The plaintiff is Black/African (Nigerian). In addition to national-origin claims under Title VII, Plaintiff brings parallel claims under 42 U.S.C. § 1981 for intentional race discrimination

and retaliation. CareFirst deprived Plaintiff of the same right to make and enforce the employment contract including the benefits, privileges, terms, and conditions of employment as enjoyed by non-Black, South Asian/Indian colleagues. Section 1981 requires no administrative exhaustion.

## STATEMENT OF FACTS

### Defendant Carefirst Management Company LLC. ("CareFirst")

**39. Defendant Carefirst Management Company LLC. ("CareFirst")** is the largest not-for-profit health insurer in the Mid-Atlantic, serving approximately 3.5 million members in Maryland, Washington, D.C., and Northern Virginia. CareFirst does not provide direct patient care but functions as a payer, administering commercial, Medicaid, and Medicare Advantage plans.

40. To modernize its operations and improve provider data management, CareFirst initiated a digital transformation project implementing Salesforce Health Cloud V12 ("V12"), a system intended to centralize provider data, streamline credentialing, and modernize internal operations. This project required assembling a new specialized team, distinct from CareFirst's existing IT staff, to support configuration, automation, and deployment of the Salesforce platform.

## STATEMENT OF FACTS
### Plaintiff Damilola Obembe's Experience of Pervasive Discrimination, Isolation, and Psychological Harm at CareFirst

### 41. Plaintiff's Background and Hiring

Plaintiff Damilola Obembe is a Black African professional of Nigerian national origin, holding multiple Salesforce certifications and advanced degrees. She has years of experience as a

Salesforce Business Analyst and Project Leader.

On March 25, 2024, Plaintiff was hired by CareFirst as a Lead Business Analyst to support the Salesforce Health Cloud V12 ("V12") implementation. Her interview, conducted by former Manager Renea Joseph and Tupakula Balakrishna (South Asian, Indian national), tested her directly on Salesforce configuration, confirming CareFirst's intent to recruit a certified Salesforce professional.

42. Plaintiff was assigned to the Salesforce Configuration and Automation Team supporting the Provider Data Management and Enrollment System (PDMES). Early project documents identified both Plaintiff and Balakrishna as designated defect leads.

43. In April–May 2024, Plaintiff completed Copado/UATA training (May 28). Director Sandra Santos's "Ops Tech Defect Workbook" listed Plaintiff and Balakrishna as core V12 defect leads, circulated to the PDMES team.

**<u>Onset of Exclusion After Management Change ( May 30 , 2024 - June, 2024 )</u>**

44. On or about May 30, 2024, after former Manager Joseph's transition, Plaintiff was reassigned to Director Sandra Santos and Manager Allen Charlene (non-technical). Exclusion began immediately: removal from defect meetings, loss of Jira assignments, and denial of Copado deployment access.

45. Charlene shifted Plaintiff to "administrative support" under a non-certified colleague, Rachel Stein, while South Asian Indian comparators, especially Balakrishna retained privileged access and were elevated in authority. No performance basis was given.

46. By June 2024, Plaintiff had been excluded from all core Salesforce defect meetings and left without technical assignments, while Indian-national colleagues, including Balakrishna, continued to receive privileged access.

**False Insubordination, 911 Hypertensive Crisis, and Pretext( June 6, 2024 - June 25, 2024)**

47. On June 6, 2024, Plaintiff explained to a 26-person meeting that her access profile was restricted and requested System Administrator rights. Charlene recast this good-faith explanation as "refusal," relying on Balakrishna's account.

48. On June 25, 2024, Charlene placed a formal "insubordination" accusation in Plaintiff's personnel file, without investigating the system screenshots Plaintiff provided. Plaintiff's former manager warned that such a label would block the plaintiff's future promotions.

49. This adverse action, taken without due process, mirrors the type of pretextual discipline held actionable in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

**Medical Crisis Triggered by Discrimination - June 24, 2025**

50. Later on June 25, 2024, immediately after receiving the insubordination letter, Plaintiff suffered a hypertensive crisis (blood pressure 183/123) requiring emergency hospitalization at Howard County General Hospital.

51. Plaintiff had disclosed a pre-existing hypertension diagnosis to HR. The crisis was directly triggered by exclusion, false accusations, and retaliatory pressure. Courts have recognized that hostile work environments resulting in medical harm are actionable. See Harris v. Forklift Sys.,

Inc., 510 U.S. 17 (1993).

**Ongoing Exclusion and Retaliation**

52. Despite her medical episode, Plaintiff remained excluded from technical duties through the summer of 2024. Requests for reinstatement were ignored.

53. On August 6, 2024, in a meeting with Director Santos and HR, Plaintiff was told she was "too aggressive" and should "prove herself like Bala" and "respect her seniors." These comments minimized Plaintiff's credentials and imposed unequal standards, reflecting pretextual discrimination.

54. Only during Balakrishna's absence in August 2024 was Plaintiff briefly reassigned a Jira defect task, which she successfully completed despite restricted access. Nonetheless, her technical duties were not restored.

**Retaliation After Protected ActivityVerbal Attacks and Public DegradationJuly –August 5, 2024**

55. On or about July 1, 2024, Plaintiff submitted a formal Human Resources complaint titled "90 Days of Illegal Harassment at CareFirst," requesting an internal investigation into ongoing discrimination and unlawful harassment.

56. Rather than initiate corrective steps, CareFirst through its leadership responded with **increased retaliation**.

57. On July 18, Plaintiff requested a one-on-one meeting with Manager Charlene to discuss her mental health and professional isolation. During the meeting, when Plaintiff raised concern over being excluded from defect tickets, Charlene replied sarcastically, *"Are you sure you even know how to use the system?"* She added, *"I don't think you're ready to touch Copado."*

58. This exchange triggered a resurgence of depression and commencement of anxiety symptoms, which Plaintiff later disclosed to her therapist. Plaintiff reached out to a colleague, Darius Davis, in tears, who recommended she speak with Director Sandra Santos.

59. Around this time, Plaintiff consulted Tom Barrett, a Salesforce-certified senior engineer on the Deployment Management Team. After hearing she had no technical tasks, Barrett asked, "Then where is Bala getting his assignments from?"—confirming tasks were being routed away from Plaintiff.

**Headquarters Meeting ("Too aggressive," "Stay in your lane") August 6, 2024**

**60.** Plaintiff met with Director Sandra Santos and Employee Relations officer Vernae Church at CareFirst HQ. She again reported: (1) denial of defect assignments; (2) removal from Jira, Copado, and testing walk-throughs; and (3) the falsity of the "insubordination" charge. During the discussion, she was told she was "too aggressive" and to "stay in your lane."

**Hostile Work Environment and Retaliatory Discrimination (Racially Coded Hierarchy) — Sept. 27, 2024–Feb. 2025**

61. On September 27, 2024, HR closed the investigation with a conclusory "no wrongdoing" finding and no corrective action, effectively ratifying the racially coded hierarchy and perpetuating the hostile work environment.

62. In the same meeting, HR demeaned Plaintiff's role, saying her Lead BA title "was only because of your salary," and instructed her in her statement "You need to stay in your lane"These racially coded directives enforced a workplace hierarchy positioning a Black African/Nigerian professional as subordinate to South Asian/Indian comparators.

63. HR's statements paired with continued exclusion from Jira, Copado, and walk-throughs signaled that Plaintiff would be denied technical authority regardless of merit, while South Asian/Indian colleagues were privileged.

64. Plaintiff became visibly and audibly emotional, at times crying on calls, as she attempted to articulate the emotional toll of exclusion, degradation, and denial of technical access. Despite clear signs of psychological harm, CareFirst failed to take any meaningful remedial action. Instead, it conducted a protracted three-month internal investigation that resulted in a conclusory denial of wrongdoing but an admittance of Racial Hierarchy between South Asian/ Indian and Black African / Nigerian.

65. This deliberate disregard of Plaintiff's emotional deterioration and evidence constitutes employer indifference to a hostile work environment, violating the standard established in Vance v. Ball State University, 570 U.S. 421 (2013), which holds employers liable when they knew or should have known of discriminatory harassment and failed to take corrective action.

**<u>Retaliation via Email Exclusion and Systemic Blocking (November 12, 2024)</u>**

66. On November 12, 2024, Plaintiff discovered she had been removed from the OpTech Project email distribution list, the official channel for routing V12 defects. CareFirst simultaneously created a new Outlook list, "V12 Deployment Group," that included every internal V12 support member, including Tupakula Balakrishna, except Plaintiff.

67. Outlook groups are manually configured; adds/removals require deliberate action. The new list controlled the highest-volume defect stream during post-implementation instability. Plaintiff's exclusion cut off assignments and core project communications.

68. The timing coincided with CareFirst's receipt of notice of Plaintiff's MCCR Charge, supporting causation and an inference of retaliation. This is a materially adverse action under Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). See also EEOC v. New Breed Logistics, 783 F.3d 1057 (6th Cir. 2015) (exclusion from work communications post-complaint is retaliatory); Hochstadt v. Worcester Found., 425 F. Supp. 318 (D. Mass. 1976), aff'd, 545 F.2d 222 (1st Cir. 1976) (exclusion from duties/communications may constitute retaliation).

**Comparator Yamini Rejeti Elevated Without Scrutiny November–December 2024**

**69. Disparate Treatment and Comparator-Based Analysis Demonstrating Pretext**

During the same period that Plaintiff was denied technical responsibilities, CareFirst elevated Yamini Rejeti a South Asian/Indian recent graduate with no Salesforce certifications, placed via the PwC Acceleration Centre (Ajinkya Devi team) to full defect-assignment roles on the V12 support team. Rejeti was integrated without delay or vetting and was promptly granted Copado deployment access, Medicaid subsystem work, and technical walk-throughs opportunities Plaintiff repeatedly requested and was denied.

70. Centralized Assignment Control, Same Supervisors. Throughout the relevant period, all Jira/Copado assignments, access permissions, meeting invitations, and performance inputs for Plaintiff, Tupakula Balakrishna, and Yamini Rejeti were issued or approved by Manager Allen Charlene, with Director Sandra Santos as the next-level decisionmaker. Plaintiff and her South Asian/Indian comparators reported to the same manager (Allen Charlene) and director (Sandra Santos), and were governed by the same policies and workflows, underscoring that the disparate treatment occurred under the same supervisors.

71. By contrast, Manager Allen Charlene repeatedly questioned Plaintiff's competence and restricted her access, asking in a recorded meeting, "Do you even know how to make changes to the system?" and "I don't think you should be touching the system." The unequal standards and preferential access for Rejeti, despite lesser credentials, are consistent with pretextual disparate treatment against a Black African (Nigerian) comparator.

## Continued Marginalization and Denial of Accommodation – January 27, 2025

72. By January 2025, Plaintiff's exclusion had lasted nearly eight months. She formally requested reassignment as a reasonable accommodation under the ADAAA, citing worsening psychiatric and cardiovascular symptoms.

73. Plaintiff disclosed to  HR Director Alex Doring on the call showing ; visible tremors, short-term memory loss, and exhaustion, corroborated by her physician and therapist. Both her physiotherapist and psychiatrist submitted medical letters recommending immediate reassignment.

74. HR Director Alex Doring dismissed her request, stating reassignment was "not in the business's interest" and suggesting that, since Plaintiff had filed externally with the MCCR, CareFirst was not obligated to act.

Despite available lateral opportunities, CareFirst refused reassignment, leaving Plaintiff on the same team that had caused documented psychiatric harm.

## Negative Performance Evaluation and Financial Harm – February 28, 2025

On February 28, 2025, Plaintiff received her annual performance evaluation, authored by Charlene with input from Balakrishna in attendance of Director Sandra Santos. The evaluation

falsely criticized her technical knowledge and turnaround time, ignoring that she had been denied access for months.

76. As a result, Plaintiff's bonus was reduced, her personnel file permanently marked with negative remarks, and her eligibility for promotions and salary increases impaired. Courts have held that such retaliatory evaluations constitute adverse employment actions. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

## Medical Deterioration and Protected Leave – March 17, 2025

77. Following the retaliatory evaluation, Plaintiff's psychiatric symptoms escalated. On February 28, 2025, she experienced suicidal ideation, calling her therapist and stating, "They won't stop until I kill myself." She was placed under crisis intervention care and subsequently. She subsequently went on FMLA leave.

78. Plaintiff has since been diagnosed with PTSD, major depressive disorder, anxiety disorder, and treatment-resistant depression requiring Spravato therapy. These conditions are recognized disabilities under the ADAAA. See Colwell v. Rite Aid Corp., 602 F.3d 495 (3d Cir. 2010); Fox v. Costco Wholesale Corp., 918 F.3d 65 (2d Cir. 2019).

## Project-Level Pattern and Eleven-Month Continuity

79. Across eleven months, CareFirst operated a V12 team that consistently favored South Asian Indian personnel in assignments, access, and authority, while Plaintiff, the only Black African (Nigerian) Salesforce-certified professional on the team was excluded, discredited, and retaliated against.

The cumulative conduct false discipline, removal from distribution lists, denial of technical access, refusal to reassign despite medical documentation, hostile remarks, and financial

penalties created an objectively hostile work environment and caused serious medical and economic harm, violating Title VII, 42 U.S.C. § 1981, the ADAAA, and Burlington Northern.

**Agency and Employer Liability (Applies to All Counts)**

80. At all relevant times, Manager Allen Charlene and Director Sandra Santos exercised supervisory authority over Plaintiff's assignments, access, evaluations, and discipline. Under Vance v. Ball State Univ., 570 U.S. 421 (2013), their actions are attributable to CareFirst. Because Plaintiff suffered tangible employment actions including removal from core workstreams and communications, a negative evaluation with bonus impact, and false discipline

81. CareFirst is vicariously liable for supervisor harassment and discrimination; alternatively, CareFirst is liable for negligence in failing to prevent or correct known harassment and retaliation under Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). CareFirst had actual and constructive notice through repeated complaints to HR/Employee Relations and leadership (June–Nov. 2024; Jan.–Feb. 2025) and failed to take prompt, effective remedial action.

## COUNT I

### Disparate Treatment on the Basis of National Origin
(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2)
(Pled in the alternative under 42 U.S.C. § 1981 as race-based discrimination)

82. Plaintiff incorporates the paragraphs under "Parties," "Jurisdiction," "Venue and Employer Coverage,"; "Administrative Exhaustion & Timeliness," and only those factual paragraphs specifically describing the disparate-treatment allegations supporting this Count.

83. In the alternative to her Title VII national-origin claim, Plaintiff is Black/African; Nigerian; non-Black South Asian/Indian peers under the same supervisors and subject to the same performance standards received assignments, access, and favorable evaluations that Plaintiff was denied because of race, depriving her of equal contractual terms under 42 U.S.C. § 1981.

84. In the alternative to her Title VII national-origin, Plaintiff is Black/African; non-Black South Asian/Indian peers under the same supervisors received assignments, access, and favorable evaluations denied to Plaintiff because of race, depriving her of equal contractual terms under 42 U.S.C. § 1981.

85. Plaintiff is Black/African, Nigerian. Under the same supervisors Manager Allen Charlene and Sandra Santos and the same policies, CareFirst treated South Asian/Indian colleagues including Tupakula Balakrishna and Yamini Rejeti more favorably by granting access, assignments, and evaluations that were denied to Plaintiff.

86. Plaintiff brings this claim under Title VII, which prohibits discrimination in the terms, conditions, and privileges of employment because of national origin. Plaintiff was qualified (including Salesforce certification and training) yet was denied core assignments and access, excluded from meetings and distribution groups, issued a negative evaluation, and denied Phase-2/Medicaid work while South Asian/Indian colleagues were granted those opportunities. These actions materially affected compensation and advancement (including bonus and promotion pathways). The stated "business need" rationale was a pretext for unlawful discrimination.

87. These assignment denials and access restrictions materially suppressed Plaintiff's compensation, Promotion and advancement at Carefirst by cutting her off from defect ownership, bonus-eligible contributions, and promotion-track visibility within the V12 team.

88. Plaintiff is a Black African of Nigerian national origin and, during the V12 Salesforce implementation (PDMES), was the only Nigerian/non-Indian technical professional on the internal team. Her primary comparators were South Asian/Indian colleagues, including Tupakula Balakrishna and Yamini Rejeti.

89. Throughout the relevant period, all Jira/Copado assignments, access permissions, meeting invitations, and performance inputs for Plaintiff, Balakrishna, and Rejeti were issued or approved by Manager Allen Charlene, with Director Sandra Santos as the next-level decisionmaker.

90. Plaintiff and her comparators reported to the same manager and director and were subject to the same policies and workflows.

91. Defendant, acting through Charlene and Santos, intentionally subjected Plaintiff to disparate treatment because of her Nigerian national origin by:

(a) excluding her from core Salesforce defect resolution workflows and development walk-throughs;

(b) denying or restricting Jira, Copado, INTA/UATA, and configuration access;

(c) reassigning her to non-technical, clerical-level tasks despite her certifications and role;

(d) omitting her from Phase 2 (Medicaid) development access while granting Indian-national peers leadership exposure; and

(e) removing her from the OpTech defect distribution list and excluding her from the new "V12 Deployment Group," thereby cutting off assignments and core communications.

92. These actions were intentional and motivated, in part, by race (Black/African), thereby denying Plaintiff the same contractual benefits and privileges as non-Black employees, in violation of § 1981. At the same time, Indian-national colleagues with equal or lesser qualifications Balakrishna and Rejeti (the latter without Salesforce certifications at elevation) were granted privileged deployment credentials, Medicaid subsystem work, technical walk-throughs, and full defect ownership under the same supervisors.

93. All adverse assignment and access decisions were made or ratified by the same decision-makers Manager Allen Charlene and Director Sandra Santos within the same chain of command.

94. Defendant's proffered rationale that Plaintiff lacked "platform readiness" or "technical capability" was pretextual. Plaintiff held current Salesforce certifications (including Platform App Builder), completed advanced solution-architecture training, was named a defect lead in the Ops Tech Defect Workbook, and successfully completed Jira defect work when assignments were briefly provided while many of the "deficiencies" cited flowed from management-imposed access restrictions.

95. Defendant further maintained a project staffing pattern that overwhelmingly favored Indian nationals, including through vendor teams (Cognizant, Infosys, PwC Acceleration Centre), and implemented assignment and access decisions that preferentially advanced South Asian/Indian personnel under Charlene and Santos's unified control.

96. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff was denied equal terms and conditions of employment, including high-value assignments, credentials, and advancement opportunities; suffered a reduced bonus and impaired promotion prospects; sustained reputational harm within the Salesforce ecosystem; and experienced serious psychiatric injury necessitating protected leave and treatment.

97. Defendant's actions constitute unlawful discrimination on the basis of national origin in violation of 42 U.S.C. § 2000e-2(a) (and, in the alternative, race-based discrimination under 42 U.S.C. § 1981). Defendant acted intentionally, willfully, and with reckless disregard for Plaintiff's federally protected rights. CareFirst is vicariously liable for the acts of Charlene and Santos under Vance and Faragher/Ellerth.

## COUNT II

### Hostile Work Environment on the Basis of National Origin
(Violation of Title VII, 42 U.S.C. § 2000e-2; pled in the alternative under 42 U.S.C. § 1981 as race-based discrimination)

98. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.Title VII and § 1981 prohibit discrimination that is severe or pervasive enough to create a hostile work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993).

99. Plaintiff is a Black African, Nigerian Tech professional. Her primary comparators on the V12/PDMES project were South Asian/Indian colleagues including Tupakula Balakrishna and Yamini Rejeti. Assignments, access, meeting invites, and performance inputs for Plaintiff and these comparators were controlled by Manager Allen Charlene and approved by Director Sandra Santos. The hostile conduct occurred under the same supervisors and policies.

100. For § 1981, Plaintiff alleges differential treatment because of race (Black/African) vis-à-vis South Asian/Indian colleagues under the same supervisors and policies. All similarly situated technical team members including South Asian/Indian colleagues were granted Medicaid/UATA environment access; Plaintiff alone was denied.

101. The foregoing conduct including exclusion from meetings and defect workflows, removal from project email groups, and the "stay in your lane" directive were severe or pervasive, altered the terms and conditions of employment, and were motivated by race (Black/African), thereby violating Plaintiff's contractual rights protected by § 1981.

102. From approximately March 25, 2024 through February 2025, Plaintiff was subjected to a sustained pattern of exclusion, including:

 (a) removal from core defect triage, development walk-throughs, and configuration meetings;

 (b) denial/restriction of Jira, Copado, INTA/UATA and related credentials;

(c) reassignment to non-technical clerical tasks despite certifications;

(d) email exclusion removal from the OpTech list and exclusion from the new "V12 Deployment Group," cutting off defect assignments; and

(e) Phase 2 (Medicaid) access gating every other technical team member (internal and vendor, including Infosys/PwC) was granted Medicaid development-environment access and integration work, except Plaintiff.

103. Management used demeaning, racially coded directives to enforce a hierarchy subordinating Plaintiff to South Asian/Indian peers, including: "too aggressive," "stay in your lane," "prove yourself like Bala," and "Do you even know how to make changes to the system?"

104. The hostile pattern included false insubordination, triggering a pre existing cardiovascular 911 emergency call, public discrediting of Plaintiff's technical input while validating lesser-qualified Indian comparators (including Rejeti, elevated without Salesforce certification), and micromanagement of trivial tasks while withholding substantive work. Plaintiff had been identified as a defect lead in the Ops Tech Defect Workbook, yet was stripped of corresponding duties.

105. Carefirst had actual notice via Plaintiff's repeated complaints July 1, 2024 HR complaint; Sept. 27, 2024 Employee Relations meeting; Nov. 12, 2024 email exclusion) but took no corrective action, allowing the conduct to continue for approximately eleven months. Employer inaction despite notice establishes liability. See Vance v. Ball State Univ., 570 U.S. 421 (2013).

106. The totality of circumstances, continuous exclusion, access gatekeeping, public degradation, and comparator favoritism altered the terms and conditions of employment, causing severe psychological injury (PTSD, major depressive disorder, anxiety, treatment-resistant depression requiring Spravato) and economic harm.

107. From late May 2024 through July 2024, Plaintiff was excluded from the weekly V12/PDMES stand-ups for consecutive weeks; beginning in May 2024, Plaintiff was removed from the V12 "D2D" all-hands meetings (VP-led) and continued to be excluded on a recurring basis through February 2025. During this period, although Plaintiff completed Copado training and was issued login credentials, Manager Charlene Allen directed Plaintiff not to use Copado, effectively denying functional access from May 2024 through August 2024.

108. Plaintiff was the only team member not registered for Phase 2 Medicaid sandbox credentials from October 18, 2024 through March 31, 2025, even though every team including non–Salesforce-certified contractors had access. This occurred despite Plaintiff's written requests, and Plaintiff was also subjected to demeaning directives and racial slurs. These actions occurred under Carefirst People Leader ,Manager Charlene Allen and Director Sandra Santos and continued despite HR complaints on July 1, 2024 and the MCCR/EEOC filing on October 25, 2024.

109. Defendant's conduct created and maintained a hostile work environment because of Plaintiff's national origin Nigerian and, in the alternative, race under § 1981), in violation of Title VII and § 1981.

## COUNT III

### Retaliation for Protected Activity
(Violation of Title VII, 42 U.S.C. § 2000e-3(a); pled in the alternative under 42 U.S.C. § 1981 for opposition to race discrimination)

110. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.Title VII prohibits employers from retaliating against an employee for opposing discrimination or participating in the complaint process, 42 U.S.C. § 2000e-3(a). Section 1981 likewise prohibits retaliation for opposing **race** discrimination. See CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008).

111. Plaintiff engaged in protected activity by: (a) June 2024 complaints to management that Black American /Black African employees (including Plaintiff and two Black American analysts) were being excluded from PwC-led Salesforce solution training and hands-on

assignments in favor of South Asian/Indian colleagues; (b) reiterating those complaints on September 27, 2024 to Manager Allen Charlene; (c) Repeatedly complaining to management and HR in May–June 2024 about exclusion from technical work and unequal treatment vis-à-vis South Asian/Indian comparators; Submitted HR complaint he July 1, 2024 titled "90 Days of Illegal Harassment at CareFirst," requesting an internal investigation;

(d) filing a dual-filed MCCR/EEOC charge on or about October 25, 2024. Plaintiff's complaints expressly opposed race-based favoritism/exclusion as well as national-origin discrimination. See 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981. (e) In January 2025, requesting reassignment as a reasonable accommodation due to documented psychiatric injury (ADA retaliation addressed in Count IV). These complaints expressly opposed discrimination based on national origin and race (Black/African) and therefore constitute protected activity under Title VII and § 1981.

112. Manager Allen Charlene and Director Sandra Santos were informed of Plaintiff's protected activity July 1, 2024 HR complaint and Oct. 25, 2024 MCCR/EEOC filing;

113. Manager Allen Charlene and Director Sandra Santos took materially adverse actions within weeks that would dissuade a reasonable worker from complaining, including:

(a) issuing a false "insubordination" entry on June 25, 2024;

(b)continuing to deny Jira/Copado/INTA-UATA access and defect assignments despite Plaintiff's certifications;

(c) removing Plaintiff from the OpTech/V12 email stream and excluding her from the new "V12 Deployment Group" on November 12, 2024, cutting off assignment flow;

(d) restricting Plaintiff to menial "list view" tasks while comparators received full development work;

(e) delivering a retaliatory negative performance evaluation on February 28, 2025, resulting in a reduced bonus and lasting personnel-file harm; and

(f) refusing reassignment despite medical documentation and available roles, with statements such as "not in the business's interest" and "we'll have to agree to disagree."

114. The adverse actions occurred in close temporal proximity to Plaintiff's internal complaints and the Employer's receipt of MCCR notice ( email-group exclusion on Nov. 12, 2024), and were executed by the same decisionmakers who were the subject of Plaintiff's complaints (Charlene/Santos), supporting a causal inference. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

115. These actions are materially adverse because they would dissuade a reasonable worker from making or supporting a charge of discrimination."

116. CareFirst's stated reasons ( "platform readiness") were pretextual, as the limitations cited flowed from management's own access restrictions and gatekeeping. Under Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013), Plaintiff pleads that, but for her protected activity, the adverse actions including the email exclusion, negative evaluation, and denial of reassignment would not have occurred.

117. CareFirst's retaliation caused economic harm (bonus reduction, impaired promotion and pay progression), professional harm (reputational damage within the Salesforce ecosystem), and medical harm (worsening PTSD, major depressive disorder, anxiety, and treatment-resistant depression requiring Spravato), culminating in FMLA/medical leave.

118. Defendant's conduct constitutes unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a) and, in the alternative, 42 U.S.C. § 1981.

## COUNT IV

**Failure to Accommodate and Retaliation Based on Disability**
(Violation of the ADA/ADAAA 42 U.S.C. § 12112(b)(5)(A) (reasonable accommodation); 42 U.S.C. § 12203(a)–(b) (retaliation/interference); 29 C.F.R. § 1630.2(o), § 1630.12)

119. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

Plaintiff is an individual with disabilities within the meaning of the ADAAA, including PTSD, major depressive disorder, anxiety, and treatment-resistant depression (TRD). CareFirst through HR and decisionmakers Manager Allen Charlene,Director Sandra Santos and HR Director Alex Doring had actual notice via medical letters from Dr. Bergina Isbell (psychiatrist),Dr. Cindy Domingue (therapist) and by the "Emergency Feb. 28, 2025 FMLA Letter" submission noting work-related psychiatric injury.

120. Plaintiff has made four separate, consistent requests for reasonable accommodation on January 27, 2025; March 2, 2025; June 4, 2025; and June 10, 2025 each supported by documentation from licensed medical providers and seeking the same accommodation: reassignment to a different team and role. The requested reassignment would not impose an undue hardship given CareFirst's publicly posted non-technical roles and available alternatives.

121. Plaintiff was a qualified individual who could perform the essential functions of a non-technical role with reasonable accommodation, including reassignment and a treatment-compatible schedule.

122. In March 2025, after Plaintiff notified CareFirst of her psychiatric disability and sought ADA accommodation (and as she transitioned to FMLA/short-term disability leave effective March 31, 2025), CareFirst retaliated and interfered with her ADA rights by (a) escalating email and task surveillance and directing coworkers to press Plaintiff for updates notwithstanding medical restrictions; (b) assigning menial "list-view" work while denying medically compatible duties or reassignment; and later, in June 2025, (c) conditioning any return on "availability" terms that contradicted REMS treatment and provider directives conduct that would dissuade a reasonable employee from exercising ADA rights and interferes with protected accommodation activity. See 42 U.S.C. § 12203(a)–(b); 29 C.F.R. § 1630.12.

123. From June 4–10, 2025, Plaintiff submitted provider-supported ADA requests for: (a) reassignment away from the hostile V12 team; (b) temporary relief from performance pressure/monitoring during transition to protected leave; and, upon return, (c) a medically compatible schedule tied to Spravato® (esketamine) REMS: three workdays per week, six hours per day, with no on-site surprises or reactive tasks on treatment days. Spravato requires in-clinic dosing twice weekly, with ≥2 hours observed administration plus 2–4 hours dissociative recovery during which work or commuting is medically prohibited. These requests triggered the employer's duty to engage in a good-faith interactive process. 29 C.F.R. § 1630.2(o)(3); see Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312–15 (3d Cir. 1999) (interactive process).

124. Rather than remove known triggers, CareFirst through the same actors implicated in the underlying discrimination (Manager Allen Charlene and Director Sandra Santos), often via HR/Alight (i) refused reassignment as "not in the business's interest" despite available roles; (ii) second-guessed documented psychiatric limitations with non-medical judgments; and (iii)

counter-proposed a five-day "availability" model, on-site exposure, and twice-daily managerial check-ins under the same supervisors, all incompatible with REMS safety and the medical restrictions.

125. That response amounts to a failure to accommodate and bad-faith interactive process in violation of 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.2(o)(3); see EEOC v. UPS Supply Chain Solutions, 620 F.3d 1103, 1110–12 (9th Cir. 2010) (ineffective "accommodations" that leave triggers in place are denials); Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1019–22 (8th Cir. 2000) and Colwell v. Rite Aid Corp., 602 F.3d 495, 505–07 (3d Cir. 2010) (reassignment is a reasonable accommodation).

126. Despite receiving multiple provider letters, CareFirst and its leave vendor **Alight** demanded serial additional "clarifications", questioned established psychiatric limitations and questioned the legitimacy of Plaintiff's psychiatric limitations, pressuring Plaintiff to provide intrusive proof beyond what ADA regulations require, contrary to EEOC guidance limiting unnecessary medical documentation for established disabilities.

127. On June 16, 2025, after repeated requests, Plaintiff felt compelled to record a Spravato session (showing active dissociation) to "prove" functional limits an unnecessary, coercive demand that exacerbated her condition.

128. The same decisionmakers named in Plaintiff's discrimination claims Charlene and Santos controlled the ADA process and challenged medical findings, including: "Please clarify how your recommendation for a different job in the same field … is consistent with Ms. Obembe's statements that she cannot perform technical jobs." This reflects a fundamental misunderstanding

of functional limitations versus credentials and underscores conflict of interest in ADA decision-making. The question conflates credentials with functional limitations, underscoring the conflict of interest and the failure to conduct an individualized assessment. See Fox v. Gen. Motors Corp., 247 F.3d 169, 177–79 (4th Cir. 2001) (recognizing ADA protections in the face of psychological impairment and employer indifference).

129. CareFirst's failures and retaliatory acts worsened Plaintiff's condition, necessitating urgent psychiatric referral, short-term disability, and ongoing Spravato therapy. Plaintiff suffered lost wages (including bonus impacts), loss of career progression, and significant emotional distress.

130. By refusing reasonable accommodations, failing to engage in the interactive process, and retaliating/interfering after protected ADA activity, CareFirst violated 42 U.S.C. § 12112(b)(5)(A) and 42 U.S.C. § 12203(a)–(b) (and implementing regulations).

**Cognitive Impairment as a Protected Disability Under the ADAAA**

131. Plaintiff's role on the Salesforce V12 implementation required high-level executive functioning concentration, working memory, complex logic, rapid analysis, and cross-functional communication, major life activities protected by the ADAAA, including "concentrating, thinking, communicating, and working." See 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i).

132. In March through August 2025, Treating providers (therapist Dr. Cindy Dominique and psychiatrist Dr. Bergina Isbell) documented trauma-induced cognitive impairment manifested by short-term memory lapses, cognitive fatigue, tremors with concentration, difficulty sustaining attention/sequence, and dysregulation when re-exposed to technical tasks associated with the

V12 team. These disabilities substantially limit one or more of Plaintiff's major life activities, including but not limited to sleeping, concentrating, thinking, and working

133. Plaintiff was diagnosed with major depressive disorder, PTSD, and, following a 2025 collapse, treatment-resistant depression conditions that substantially limit brain function, concentration, and working memory. See 29 C.F.R. § 1630.2(j)(3)(iii) (recognizing cognitive limits in demanding occupational contexts). These limitations were functionally validated by her inability to engage in Salesforce configuration work without retraumatization.

134. The impairment was caused and exacerbated by Defendant's discriminatory exclusion, public discrediting, and retaliatory reassignment; the resulting condition substantially limited Plaintiff's ability to perform the essential cognitive functions of her technical role. The disability is therefore cognizable under the ADAAA.

**Failure to Engage in the Interactive Process; Constructive Denial of Accommodation**

135. In June 2025, Plaintiff re-engaged the ADA interactive process with updated medical records. Her psychiatrist prescribed Spravato® (esketamine) under FDA REMS, requiring in-office dosing twice weekly with enforced post-treatment dissociation/recovery during which work is medically contraindicated. Providers requested: (a) a three-day remote schedule with reduced hours on non-treatment days; (b) reassignment to a non-technical, non-triggering team

136. Plaintiff was a qualified individual who could perform the essential functions of a non-technical role with reasonable accommodation, including reassignment and a reduced, treatment-compatible work schedule. Reassignment to a vacant, non-technical role is a

reasonable accommodation where the current placement is incompatible with the disability. See Colwell v. Rite Aid, 602 F.3d 495, 505–06 (3d Cir. 2010).

137. On June 13, 2025, Defendant (through HR ADA managers and Alight) issued a 'Reasonable Accommodation' response proposing a five-day schedule, on-site availability, and twice-daily managerial "check-ins"  leaving Plaintiff under the same managers identified as triggers

138. Those terms contradicted medical directives and did not remove known triggers, amounting to constructive denial of accommodation and a failure to engage in good-faith under 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.2(o)(3). See, e.g., Taylor v. Phoenixville Sch. Dist., 184 F.3d 296 (3d Cir. 1999) (interactive process), and EEOC v. UPS Supply Chain Solutions, 620 F.3d 1103 (9th Cir. 2010) (ineffective accommodations that leave triggers in place).

139. Defendant failed to engage in a good-faith interactive process and instead proposed measures that contradicted medical restrictions and perpetuated the same triggering environment.

140. Rather than reduce cognitive load or reassign as requested, Defendant imposed surveillance-style oversight and preserved the hostile supervisory structure responses incompatible with Plaintiff's disability and treatment protocol.

141. Defendant's actions were causally connected to Plaintiff's ADA-protected requests and disclosures and resulted in concrete harm, including medical leave and loss of wages.An employer's refusal to tailor accommodations to the disability-related limitations supports ADA liability. See Fox v. Gen. Motors, 247 F.3d 169, 178–79 (4th Cir. 2001).

**Career Trajectory and Reputational Harm in a Specialized Ecosystem**

142. Plaintiff's Salesforce career path (from Analyst to Architect/Consultant) depends on hands-on deployments, privileged system access, and visible configuration leadership. Over roughly eleven months, Defendant's exclusion from core workstreams, false performance narrative, and ensuing psychiatric disability derailed that trajectory, causing reputational injury in a networked ecosystem where recent, referenceable V12 experience is a gatekeeper to advancement.

143. As a direct result, Plaintiff faces diminished earning capacity, lost advancement opportunities, and ongoing stigma not from performance failure, but from discrimination and the resulting ADA-qualifying impairments. These damages are compensable and flow from Defendant's Title VII/§ 1981 discrimination and ADA failures.


# COUNT V

**(Disparate Impact – National Origin)**
**(Violation of Title VII, 42 U.S.C. § 2000e-2(k))**

144. Plaintiff re-alleges and incorporates all prior paragraphs.

145. Plaintiff brings this individual disparate-impact claim challenging specific, facially neutral staffing and access practices used on CareFirst's Salesforce "V12/PDMES" implementation team that disproportionately excluded non-Indian professionals and particularly Plaintiff, a Black African (Nigerian) from high-value technical work.

146. Plaintiff challenges facially neutral practices used on the V12 team South Asian Indian-majority vendor pipelines and referrals, informal credentialing and access routing, and

non-transparent selection for deployment/defect work that resulted in >90% Indian-national staffing in technical roles during the relevant period and a corresponding exclusion of non-Indian candidates.

147. The challenged practices within the defined employment unit (the internal V12/PDMES technical team and its integrated vendor pipeline) include, without limitation:

(a) sourcing and staffing through Indian-majority vendors (including PwC Acceleration Center and Infosys) and informal referral channels;

(b) System Access gating (UATA/Medicaid sandbox, Copado, and production-adjacent permissions) controlled by the same managers who restricted Plaintiff's access;

(c) restricting meeting invitations and Outlook/Teams distribution lists (including creation of the "V12 Deployment Group") to a core set of Indian-national personnel; and

(d) exclusionary distribution-list rules that resulted in a workforce composed of more than 90% Indian/South Asian personnel, thereby denying non-Indian employees like Plaintiff comparable access to high-value work. (e) referral-only selection for unposted roles ("shoulder taps"), including roles filled via the PwC team, which resulted in a workforce exceeding 90% Indian/South Asian and denied non-South Asian; Indian workers like Plaintiff comparable access to high-value Job.

148. Applied together, these neutral-on-paper rules and pipelines produced a workforce on the V12/PDMES technical team that was overwhelmingly South Asian/Indian, while non-Indian candidates, specifically Plaintiff, a certified Black African, Nigerian professional were denied comparable access to tasks, credentials, and advancement.

149. The adverse impact is measurable and is evidenced by contemporaneous logs and records already in Plaintiff's possession, including team composition and access data. Plaintiff will further confirm and quantify this impact through discovery, using standard Title VII methods (workforce/availabilitycomparisons,applicantflow,incumbencyanalyses,andaccess-to-opportunity metrics). Preliminary team composition and access logs reflect that well over 90% of deployment/configuration roles were staffed with Indian-national personnel, while Plaintiff the only Black African (Nigerian) analyst on the internal team was excluded from defect ownership, Medicaid environments, and deployment meetings despite equal or superior platform credentials.

150. CareFirst has asserted "business need" for these practices (including vendor-pipeline reliance and access gating). The practices are not job-related for the actual configuration roles at issue (low-code, metadata-driven Salesforce work), nor consistent with business necessity under 42 U.S.C. § 2000e-2(k)(1)(A)(i).These practices are not job-related and not consistent with business necessity; in all events, less discriminatory alternatives skills-based selection, transparent access criteria, and open competition for deployment roles were available and would have met any asserted business ne

151. In all events, less discriminatory alternatives were and are available, including:

 (a) open, skills-based posting and selection for V12 roles; (b) credential-driven access criteria (e.g., current Salesforce certification) rather than legacy coding histories;

 (c) transparent rotation for high-value tasks and environment credentials; and

 (d) inclusive distribution-list governance and meeting access rules tied to role, not nationality or vendor affiliation. See 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

152. As a direct result of these practices, Plaintiff suffered material loss of access to development workstreams, credentials, and visibility necessary for work and career advancement, causing economic and professional harm.

## Conclusion

153. Plaintiff a Black African of Nigerian national origin and a qualified individual with psychiatric disabilities (PTSD, major depressive disorder with treatment-resistant features, and anxiety) was subjected to intentional disparate treatment, a hostile work environment, and retaliation by CareFirst and its agents, including Manager Allen Charlene and Director Sandra Santos.

154. Over approximately eleven months, Defendants excluded Plaintiff from core assignments and meetings, stripped her of system access, falsely branded her "insubordinate," removed her from project distribution lists after protected complaints, and issued a retaliatory evaluation, while elevating South Asian/Indian comparators with equal or lesser qualifications. This pattern establishes pretext and disparate treatment (McDonnell Douglas), a hostile environment severe or pervasive enough to alter conditions of employment (Harris), and retaliation that would dissuade a reasonable worker from complaining (Burlington Northern). Defendants also failed to accommodate Plaintiff's psychiatric disability in violation of the ADAAA, as recognized by Colwell and Fox.

155. The unlawful conduct caused and aggravated serious, documented harm including a June 25, 2024 hypertensive crisis and subsequent treatment-resistant depression requiring Spravato substantially limiting major life activities such as thinking, concentrating, and working.

156. Plaintiff satisfied all administrative prerequisites, engaged the interactive process in good faith, and proposed reasonable accommodations (including neutral reassignment and schedule modifications). Defendants responded with surveillance-style "accommodations," preserved the same triggering supervisory structure, and refused reassignment constituting a constructive denial of accommodation under the ADA.

157. Plaintiff respectfully asks the Court to enter judgment in her favor and award all available legal and equitable relief, including declaratory and injunctive relief; neutral reassignment or front pay; back pay and lost benefits; compensatory damages for emotional distress and reputational harm; punitive damages where authorized (including under 42 U.S.C. § 1981); reasonable attorneys' fees and costs; pre- and post-judgment interest; and such other relief as the Court deems just and proper.

## Reservation of Supplemental Allegations (Rule 15(d))

158. Plaintiff reserves the right to move for leave under Fed. R. Civ. P. 15(d) to supplement this pleading with post-filing ADA retaliation/interference facts including, without limitation, the refusal to provide paystubs needed for disability-benefit processing and the handling/misclassification of short-term disability and related leave should supplementation become appropriate as events and records are further developed. Nothing herein waives Plaintiff's ability to seek such supplementation.

## **Prayer for Relief**

159. WHEREFORE, Plaintiff Damilola Obembe respectfully requests that the Court enter judgment in her favor and against Defendant Carefirst Management Company LLC. and award the following relief:

a. A declaration that Defendant's conduct violated Plaintiff's rights under Title VII, 42 U.S.C. § 1981, and the ADA/ADAAA.

b. A permanent injunction prohibiting Defendant, its officers, managers, agents, and those acting in concert with them, from discriminating or retaliating against Plaintiff (or others) based on race, national origin, or disability.

c.Removal from Plaintiff's personnel file of the fabricated "insubordination" entry, the retaliatory performance evaluation, and any other documents created in retaliation or based on discriminatory pretext; and placement of a corrective notation in her file.

d.Implementation of lawful, nondiscriminatory procedures for task assignment, access to systems, performance evaluation, distribution lists, and development opportunities; mandatory manager training on Title VII/§ 1981/ADA obligations; and posting of notices of employee rights.

e. Back pay, front pay, lost bonuses, lost benefits, and all other compensation Plaintiff would have earned but for Defendant's unlawful conduct, including future lost earnings and benefits to address ongoing career and reputational harm.

f.Damages for emotional pain, suffering, mental anguish, loss of enjoyment of life, reputational injury, and career derailment proximately caused by Defendant's unlawful acts.

g. Punitive damages where authorized by law, including under 42 U.S.C. § 1981, for Defendant's willful and reckless disregard of Plaintiff's federally protected rights.

h.A neutral-reference directive and a written corrective statement, to be distributed to appropriate internal stakeholders, clarifying that prior adverse statements regarding Plaintiff's performance and access were not merit-based but arose from unlawful conduct.

i. Pre- and post-judgment interest on all monetary awards at the maximum rate permitted by law.

j. Reasonable attorneys' fees (if counsel appears), expert witness fees, and costs pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 12205, and other applicable provisions; and, while proceeding pro se, reimbursement of verifiable litigation expenses and expert costs.

k. Such other legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Damilola M. Obembe, appearing pro se, respectfully demands a trial by jury on all issues so triable in this action.

**DATED: 9/25/2025**

**Respectfully submitted,**

**Damilola M. Obembe**
Pro Se Plaintiff
7661 Arundel Mills Blvd #1158
Hanover, MD 21076
Phone: (410) 705-4571
Email: obembefederalcase@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2025, I served a copy of the foregoing Amended Complaint via the Court's CM/ECF electronic filing system, which will send notification of such filing to Defendant's counsel of record:

Donald E. English, Jr.

Morgan, Lewis & Bockius LLP

1111 Pennsylvania Avenue NW

Washington, DC 20004

Email: **donald.english@morganlewis.com**

Respectfully submitted,

**/s/ Damilola M. Obembe**

**Damilola M. Obembe**

Pro Se Plaintiff

7661 Arundel Mills Blvd. #1158

Hanover, MD 21076

Email: obembcfcderalcase@gmail.com

Phone: (410) 705-4571

9 | 25 | 2025